## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF ILLINOIS
## EAST ST. LOUIS DIVISION

| | | |
|---|---|---|
| **JOHN STULL, RANDALL QUICK,** | ) | |
| **LaSHONDA STIFF, FAYE MORRISON,** | ) | |
| **JEFF HARTMAN and POLLY HARTMAN,** | ) | |
| **JPH DEVELOPMENT, INC., a Missouri Corporation,** | ) | |
| **wholly owned by JEFF HARTMAN and** | ) | |
| **POLLY HARTMAN; COURTNEY SPEED,** | ) | |
| **KWAME THOMPSON, JORGE GONZALEZ,** | ) | |
| **NIKKY SHOTWELL, GRACE PERRY,** | ) | |
| **DAVID KLEINE** and **SUSAN KLEINE** | **)** | |
| **Individually and on Behalf of Similarly** | ) | |
| **Situated Individuals;** | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Cause No.08-cv-565-GPM |
| | ) | |
| **YTB INTERNATIONAL, INC.,** A Delaware corporation; | ) | |
| **YOURTRAVELBIZ.COM, a/k/a YTB.COM,** a Delaware | ) | |
| Corporation; **YTB TRAVEL NETWORK, INC.,** a | ) | |
| Delaware Corporation; **YTB TRAVEL NETWORK OF** | ) | |
| **ILLINOIS, INC.,** an Illinois Corporation; **J. LLOYD** | ) | |
| **TOMER**, an individual; **J. SCOTT TOMER**, an | ) | |
| individual; **J. KIM SORENSEN**, an individual; **ANDREW** | ) | |
| **CAUTHEN**, an individual; **MERIDIAN LAND CO.,** an | ) | |
| Illinois Corporation, **WINFIELD DEVELOPMENT,** | ) | |
| **LLC**, an Illinois Corporation, **CCMP, INC.,** an Indiana | ) | |
| Corporation, **CLAY O. WINFIELD**, an individual; and, | ) | |
| **ROBERT VAN PATTEN**, an individual; | ) | |
| | ) | |
| Defendants. | ) | |

## FOURTH AMENDED CONSOLIDATED COMPLAINT

Plaintiffs John Stull, Randall Quick, LaShonda Stif, Faye Morrison, Jeff and Polly

Hartman, JPH Development, Inc., Courtney Speed, Kwame Thompson, Jorge Gonzalez, Nikky

Shotwell, Grace Perry, and David and Susan Kleine, individually and on behalf of similarly

situated individuals, and for their Complaint against Defendants YTB International, Inc.,

YourTravelbiz.com, Inc., a/k/a YTB.com, YTB Travel Network, Inc., YTB Network of Illinois,

1

Inc., J. Lloyd "Coach" Tomer, J. Scott Tomer, J. Kim Sorensen, Andrew Cauthen, Meridian Land Co., Winfield Development, LLC, CCMP, Inc. d/b/a BerylMartin, Clay Winfield and Robert Van Patten, state:

**I.**     **INTRODUCTION**

1.     Defendants have perpetrated an illegal pyramid scheme that represents one of the largest frauds in the history of the State of Illinois.  Defendants have taken over half a billion dollars from their unsophisticated customers, selling them on the dream of cheap travel and million dollar pay-outs when the only way that Plaintiffs and their class could make a net profit was by recruiting others to join the illegal pyramid scheme.  While over half of the customers received no travel commissions at all, the officers and directors of YTB International, Inc. each paid themselves multi-million dollar salaries while also siphoning tens of millions of dollars from their publicly traded corporation to privately owned corporations that they owned and controlled.  Plaintiffs and their proposed class ask this Court to end Defendants' massive fraud and to enter a judgment that compensates them for the millions of dollars that Defendants swindled.

2.     This case involves the operation of an illegal pyramid sales scheme and chain referral sales technique in violation of numerous state consumer protections statutes, including the Illinois Consumer Fraud Act ("ICFA").  The YTB Defendants have generated hundreds of millions of dollars in net revenue—$162 million in 2008 alone—doing business as, or in affiliation with, entities commonly known as "YourTravelBiz" or "YTB".  YTB Defendants derived the lion's share of their revenue—$122 million in 2008 (75% or their net revenue)— by using Independent Marketing Representatives ("IMRs") to recruit Referring Travel Agents

("RTAs") to buy Online Travel Agencies ("OTAs") from YTB Defendants.  RTAs pay

approximately $450 up-front and $50 per month thereafter to own and operate their OTAs.

      3.      IMRs receive "marketing commissions" if the persons they refer to YTB

Defendants buy OTAs, regardless of whether the OTAs generate any commissions from the sale

of travel.  IMRs receive marketing commissions on both referring persons to YTB Defendants to

buy OTAs and from OTAs sold "downline."  Downline OTA sales are OTAs sold by the "first

generation" RTAs who the original IMR personally referred to YTB Defendants, and who

subsequently referred other persons to YTB Defendants for the purchase of OTAs.

      4.      IMRs cannot reasonably expect to be effective salespersons of the OTAs upon

which their marketing commissions depend without becoming RTAs themselves (i.e., owning

and operating their own Travel Agencies).  Defendants provide further encouragement for IMRs

to become RTAs by offering to reimburse RTA fees to IMRs who sell a certain number of Travel

Agencies.  Accordingly, most, if not all, IMRs, including Plaintiffs, have also been RTAs.

      5.      Moreover, a number of different corporations and individuals conspired with

YTB Defendants by taking actions that advanced the tortious and illegal pyramid scheme and

chain sales referral technique, thereby making tens of millions of dollars in profits.  Meridian

Land Co., which is owned by YTB Directors Clay Winfield and Timothy Kaiser, M.D.,

advanced YTB Defendants' illegal objectives by contracting to provide them with property for

office space while Winfield Development, LLC developed that property.  CCMP, Inc., an

Indiana corporation for which J. Kim Sorensen is the president, advanced YTB Defendants'

objectives by providing them with marketing materials and a 130 foot replica of the Statute of

Liberty for YTB Defendants' 2008 convention in St. Louis, Missouri.  These "Conspiracy

Defendants" are liable under Illinois common law because they knowingly and voluntarily took these actions that advanced YTB Defendants' illegal objectives.

6.     On behalf of themselves and other similarly situated IMRs/RTAs, Plaintiffs seek to enjoin YTB Defendants' illegal operations, recover the fees which they and other Class Members paid, and obtain all other exemplary and punitive damages allowed by law.

## II.     JURISDICTION AND VENUE

7.     Jurisdiction in this case arises from 28 U.S.C.A. § 1332(d).  The amount in controversy in this nationwide class action exceeds $5,000,000.00, and at least one Plaintiff is a citizen of a different State from at least one Defendant.

8.     Venue in this Court is appropriate under 28 U.S.C.A. § 1391(b) and (c), because one or more of the Defendants reside in this District and because Defendants do business in this District.

9.     The Southern District of Illinois is the most desirable forum for this action because most of Defendants reside in this District, all of the subject contracts were executed in this District, most of the alleged illegal activity occurred in this District, and because the State of Illinois has an interest in preventing violations of its consumer fraud statute.

10.     This Court has jurisdiction over the Indiana corporation CCMP, Inc. under the Illinois Long Arm Statute, 735 ILCS 5/2-209, because CCMP, Inc. transacted business in the State of Illinois, because it performed contracts substantially connected to Illinois, and because it conspired to commit tortious and illegal acts within this State.

> a.     CCMP, Inc. purposefully directed its business activities at YTB Defendants, who are citizens of this District.  CCMP, Inc. continuously and repeatedly did business in Illinois with YTB Defendants.  All contracts between YTB Defendants and CCMP, Inc. were initiated, formed, negotiated and executed in the State of Illinois.  CCMP, Inc. products were ordered from this State and delivered to this State, thereby completing performance of its contracts.

4

Moreover, CCMP, Inc. continuously communicated with YTB Defendants who are located in Illinois.

b.      CCMP, Inc.'s directors, who were located in the State of Illinois, controlled the operations of this company from this State.  CCMP, Inc.'s directors made policy and business decisions from this State.

c.      CCMP, Inc. knowingly conspired with YTB Defendants to advance an illegal pyramid scheme and committed acts in furtherance of this scheme in the State of Illinois, including but not limited to providing YTB Defendants with the marketing materials necessary to operate its illegal pyramid scheme.

d.      By repeatedly transacting business in Illinois, CCMP, Inc. had fair warning it was subjecting itself to the laws and jurisdiction of this State.

## III.   **PLAINTIFFS**

### A.    **"Illinois Plaintiffs"**

11.    Plaintiff John Stull, an individual residing in Carbondale, Illinois and a citizen of the State of Illinois, was an IMR and a RTA from March, 2006 to August, 2008.

12.    Plaintiff Randall Quick, an individual residing in Edwardsville, Illinois and a citizen of the State of Illinois, was an IMR and an RTA until November, 2007.

13.    Plaintiff LaShonda Stiff, an individual residing in Alton, Illinois and a citizen of the State of Illinois, was an IMR and an RTA until June, 2008.

### B.    **"Missouri Plaintiffs"**

14.    Plaintiff Faye Morrison, an individual residing in St. Louis, Missouri and a citizen of the State of Missouri, was an IMR and a RTA from approximately October 2006 to September 2007.

15.    Plaintiffs Jeff and Polly Hartman, individuals residing in Chesterfield, Missouri and citizens of the state of Missouri, were RTAs and IMRs from approximately March, 2007 until August, 2008.

16.     Plaintiff JPH Development, Inc. is a Missouri corporation, wholly owned by Plaintiffs Jeff and Polly Hartman, with its principal place of business in Chesterfield, Missouri.

17.     Plaintiff Courtney Speed, an individual residing in St. Louis, Missouri and a citizen of the State of Missouri, was a RTA and an IMR from approximately December, 2007 until March, 2008.

18.     Plaintiffs David and Susan Kleine, individuals residing in Manchester, Missouri and citizens of the State of Missouri, were RTAs and IMRs from early 2007 until January, 2008.

**C.     "Georgia Plaintiffs"**

19.     Plaintiff Kwame Thompson is an individual residing in Atlanta, Georgia and a citizen of the State of Georgia who was an IMR and a RTA.

20.     Jorge Gonzalez is an individual residing in Douglassville, Georgia and a citizen of the State of Georgia who was an IMR and a RTA until December, 2008.

21.     Nikky Shotwell is an individual residing in Tucker, Georgia and a citizen of the State of Georgia who was an IMR and a RTA.

**D.     Utah Plaintiff**

22.     Plaintiff Grace Perry, an individual residing in Murray, Utah and a citizen of the State of Utah, was an RTA and IMR from June, 2008 until October, 2008.

**IV.     DEFENDANTS**

**A.     "YTB Defendants"**

23.     YTB International, Inc. is incorporated under the laws of the State of Delaware and has its principal place of business in Wood River, Illinois.

24.     YourTravelBiz.com, Inc. is incorporated under the laws of the State of Delaware and has its principal place of business in Wood River, Illinois.

25.     YTB Travel Network, Inc. is incorporated under the laws of the State of Delaware and has its principal place of business in Wood River, Illinois.

26.     YTB Network of Illinois, Inc. is incorporated under the laws of the State of Illinois and has its principal place of business in Wood River, Illinois.

27.     J. Lloyd "Coach" Tomer is a founder of YTB International, Inc. as well as the Chairman of its Board, and is an Illinois citizen who resides in Edwardsville, Illinois.

28.     J. Scott Tomer is a founder of YTB International, Inc., as well as its chief executive officer, and is an Illinois citizen who resides in Edwardsville, Illinois.

29.     J. Kim Sorensen is a founder and president of YTB International, Inc., and also serves as the CEO of YTB Travel Network, Inc.  He is an Illinois citizen who resides in Edwardsville, Illinois.  Defendant Sorensen is also the principal and president of CCMP, Inc.

30.     Andrew Cauthen is the president and chief executive of YourTravelBiz.com, Inc., and is an Illinois citizen who resides in Edwardsville, Illinois.

31.     Robert Van Patten is the co-CEO of YTB International, Inc., and is an Illinois citizen who resides in Edwardsville, Illinois.

**B.      "Conspiracy Defendants"**

32.     Winfield Development, LLC is an Illinois corporation with its principal place of business in Winfield, Illinois.

33.     Meridian Land Co. is an Illinois Corporation with its principal place of business in Edwardsville, Illinois.

34.     CCMP, Inc. is an Indiana corporation with its principal place of business in Griffith, Indiana.  It creates the marketing materials for YTB Defendants, and it does business under the assumed name BerylMartin.

7

35. Clay Winfield is a director and officer of YTB International, Inc. He also is a director and officer of both Meridian Land Co. and Winfield Development, LLC, and was also director and principal shareholder of Meridian Bank. He is a citizen of the State of Illinois.

## V. YTB DEFENDANTS' CORPORATE STRUCTURE AND BUSINESS FUNCTIONS

36. Defendants YourTravelBiz.com, Inc. and YTB Travel Network, Inc. are wholly owned subsidiaries of YTB International, Inc.

37. YTB International, Inc. is also the parent company of YTB Network of Illinois, Inc.

38. YTB International, Inc. conducts business primarily through divisions operated by its subsidiary agents, including YourTravelBiz.com, Inc., YTB Travel Network, Inc. and YTB Network of Illinois, Inc.

39. YTB International, Inc.'s subsidiaries perform related functions organized as follows:

    a. YourTravelBiz.com, Inc. markets OTAs via the activities of IMRs; and,

    b. YTB Travel Network, Inc., along with its subsidiary, YTB Network of Illinois, Inc., oversees travel-related services provided by or through RTAs.

40. The wholly owned subsidiaries of YTB International, Inc., YourTravelBiz.com, Inc. and YTB Travel Network, Inc., and their subsidiaries, all market their services together.

41. On paper the wholly owned subsidiaries appear to have to have independent purposes and functions; however, these entities operate as a single unit, profiting from each other's business.

## VI. YTB DEFENDANTS' SCHEME

42.     The crux of Defendants' business scheme is the sale of what Defendants called Online Travel Agencies ("OTAs"). While Defendants characterized the business opportunity they sold Plaintiffs and their class as the right to be a YTB "travel agent," this characterization is misleading because Plaintiffs and their class were not travel agents.  Plaintiffs could not sell travel packages, process payments for travel customers, issue travel tickets or other documents for travel customers, process travel refunds or receive travel commissions.[1]  Rather, Plaintiffs were the agents of travel agents who merely referred travel customers to YTB Defendants.  In their role as RTAs, Plaintiffs and their proposed class sold neither products nor services.

43.     The sales price for an OTA is a one-time fee of as much as $449.95 and a monthly fee of $49.95 thereafter.  This money was paid for the right to earn a "up to 60%" of the travel commissions collected by YTB Defendants from travel vendors for the travel YTB Defendants booked for the customers Plaintiffs referred.  YTB Defendants would set up and maintain an

---

[1] Plaintiffs' RTA contract reads in relevant part:

Travel customers deal exclusively with YTBTN except as expressly directed and authorized in advance to RTA by YTBTN, and RTA may not:

a. Receive travel customer credit card, cash or check payments or charge a fee to any travel customer. (All travel customers deal directly, whenever feasible to do so, including payment, with YTBTN or with the travel providing vendor). RTA may not receive or process credit card information; cash or check must come through YTBTN, cash in the form of certified funds only.

b. Issue travel tickets or documents for any travel customer.

c. Process travel customer refunds.

d. Engage in the promotion or sale of non-YTBTN provided travel and/or travel related services. EXCEPTION: An RTA may be actively employed by a non-internet based travel agency.

e. Utilize any non-YTBTN provided websites. No RTA website shall be linked to any non-YTBTN website without the prior written consent of YTBTN, which consent may be declined by YTBTN in its sole discretion. Contact legalsupport@ytb.com.

f. Act in any manner, or assist other RTAs so to do, to cause pending travel and travel related product and service orders to be cancelled or to be transferred to a travel agency other than YTBTN.

g. Receive or net out travel commissions from or with a travel vendor.

OTA website for Plaintiffs, and Plaintiffs could choose the name for their OTAs as well as an available domain name of their choice.  Each of those websites contained YTB Defendants' travel search engine and a means by which the persons Plaintiffs referred to that website could purchase travel from YTB Defendants.

44.    By means of a portal on their OTA website, Plaintiffs could access information concerning the travel customers they referred to YTB Defendants, the purchases by those travel customers and the portions of the travel commissions to which they had a contractual right. Plaintiffs could also communicate with YTB Defendants by means of this interactive website.

45.    In 2007 alone, OTA sales and monthly fees accounted for 73%, or $103 million, of YTB Defendants' total revenue of $141 million.  Travel-related sales accounted for less than 10% of YTB Defendants' total revenues in 2007.  In 2008, YTB Defendants' net revenue amounted to $162 million, $122 million of which was from the sale and maintenance of OTAs. In 2008, only $27 million (17% of their revenue) was generated from travel commissions.

46.    YTB Defendants also paid Plaintiffs for referring to them persons who purchased OTAs.  In fact, the only way Plaintiffs and their class could make a net profit was by referring persons to YTB Defendants who purchased OTAs.  In their roles as IMRs, Plaintiffs did not sell OTAs or any other products or services.  All contracts pertaining to OTA sales were entered by YTB Defendants and the prospective RTAs.  Plaintiffs were not parties to these contracts and could not terminate the agreements.  In other words, Plaintiffs' roles as IMRs were similar to their roles as RTAs inasmuch as their sole function was referring customers to YTB Defendants.

47.    Plaintiffs were both RTAs and IMRs. While the purchasers of OTAs (i.e., RTAs) were technically referred to YTB Defendants by Independent Marketing Representatives (IMRs), most, if not all, IMRs were also RTAs.

10

48.     YTB Defendants provide incentives for IMRs to operate their own OTAs by offering to reimburse their maintenance fees under certain circumstances.  An IMR/RTA who referred three persons to YTB Defendants that purchased OTAs qualified for reimbursement of his initial one-time RTA fee.  An IMR/RTA who sold six OTAs qualified for reimbursement of his monthly RTA fee for every month during which the sold OTAs remained active.

49.     IMRs received "marketing commissions" based upon their referral of buyers of OTAs to YTB Defendants. In addition to earning direct marketing commissions by personally recruiting RTAs to buy OTAs, IMRs also earned marketing commissions based upon all "downline" OTA referrals made either by the original IMR's recruits or by subsequent generations of recruits.

50.     IMRs' payment of the OTA fees charged to RTAs is, as a practical matter, necessary to become effective salespeople of the OTAs upon which marketing commissions are based.

51.     The practical necessity for Plaintiffs and other IMRs to become RTAs is attributable to one or more of the following circumstances:

      a.     An IMR cannot reasonably expect to successfully refer a potential buyer of an OTA to YTB Defendants (and thereby earn marketing commissions) without becoming an RTA by buying an OTA himself;

      b.     An IMR maximizes his marketing commissions by selling OTAs s to as many RTAs as possible, thereby earning commissions on OTA sales by direct and subsequent generations of RTAs who also become IMRs; and

      c.     An IMR who is also an RTA may include his own OTA purchase for purposes of earning marketing commissions on certain downline OTA sales.

## VII.   COUNT I – NATIONWIDE CLASS CLAIM AGAINST YTB DEFENDANTS UNDER THE ICFA FOR THEIR ILLEGAL PYRAMID SALES SCHEME

### A.   Applicable Illinois Law

52.   The Illinois Consumer Fraud and Deceptive Trade Practices Act prohibits both

"pyramid sales schemes" and "chain referral sales techniques."  815 ILCS § 505/2A(2).  The Act

defines a pyramid sales scheme as:

> [A]ny plan or operation whereby a person in exchange for money or other thing of value acquires the opportunity to receive a benefit or thing of value, which is primarily based upon the inducement of additional persons by himself or others, regardless of number to participate in the same plan or operation and is not primarily contingent on the volume or quantity of goods, services, or other property sold or distributed or to be sold or distributed to persons for purposes of resale to consumers.

815 ILCS § 505/1(g).  The Act defines a chain referral sales technique as:

> (1) The use or employment of any chain referral sales technique, plan, arrangement or agreement whereby the buyer is induced to purchase merchandise upon the seller's promise or representation that if buyer will furnish seller names of other prospective buyers or like or identical merchandise that seller will contact the named prospective buyers and buyer will receive a reduction in the purchase price by means of a cash rebate, commission, credit toward balance due or any other consideration, which rebate, commission, credit or other consideration is contingent upon seller's ability to sell like or identical merchandise to the named prospective buyers, is declared to be an unlawful practice within the meaning of this Act.

815 ILCS § 505/2A(1).

### B.   Application Of Illinois Law To Out-Of-State Plaintiffs

53.   The circumstances relating to the transactions at issue in this case primarily and

substantially occurred within the State of Illinois.  The two YTB subsidiaries that are the subject

of this lawsuit, YTB Travel Network, Inc. (and its subsidiary) and YourTravelBiz.com,

conducted their illegal business operations at their principal places of business in Wood River, Illinois.

    54.    Numerous facts make it clear that the transactions at issue in this case, the creation and administration of an illegal pyramid scheme through which the Plaintiffs were induced to pay sums of money in exchange for OTA websites and to induce others to pay money for such websites, primarily and substantially occurred in Illinois, including but not limited to:

a.  The two major services for which Plaintiffs paid Defendants – the licensing of RTA opportunities and the hosting of OTA websites – occurred in Illinois.

b.  The OTA websites were created, maintained, and supported by the technical staff of YTB Travel Network of Illinois in Illinois.  All communications concerning technical issues with respect to OTA websites were directed to YTB Defendants' Illinois office.

c.  Plaintiffs and YTB Defendants agreed that Illinois law was to apply to all transactions between the parties.

d.  YTB Defendants' corporate office, where all 300 of its employees work, was located in Wood River, Illinois.  This is the place where the pyramid scheme was developed, where all policies for IMRs and RTAs were created and drafted, and where all aspects of the illegal pyramid scheme were administered.

e.  All contracts between Defendants and Plaintiffs were drafted in Illinois.

f.  All RTA and IMR identification credentials were created and issued from Defendants' Illinois office.

g.  All requests for RTA and IMR marketing materials were directed to YTB Defendants' Illinois office.  All RTA and IMR marketing materials were supplied by YTB Defendants' Illinois office.

h.  All of the persons that were referred by Plaintiffs and their proposed nation wide class to YTB Defendants for the purchase of travel were customers of YTB Travel Network of Illinois.

i.  Requests for refunds for RTA fees were to be made to Defendants' Illinois office.

j.  All decisions to terminate IMR and RTA relationships were made from YTB Defendants' Illinois office.

k.  The only physical offices YTB Defendants maintained, and through which they had contact with RTAs, and IMRs were in Illinois.

l.  Every RTA had continuous contact with members of the Illinois corporate office. Every RTA was contacted by a representative in the Illinois Office upon execution of the RTA contract.  Upon paying money to become an RTA, persons the Illinois office sent each proposed member of Plaintiff's class an email welcoming them to YTB and giving them the information they needed to access their accounts.  These communications emanated from the Illinois corporate office and had the contact information of the Illinois office on its face.

m.  YTB Defendants' communications with Plaintiffs repeatedly and consistently directed Plaintiffs to contact company representatives in the Illinois office with questions and concerns.  Communications by YTB Defendants directing the Plaintiffs to contact representatives in the Illinois office were present in:

  i.  every contract between the RTAs and the YTB Defendants;

  ii.  the initial email correspondence received by each RTA upon signing up and paying the specified fee;

  iii.  the policies and procedures manual issued to each RTA;

  iv.  at various points in the RTA online training program; and,

  v.  on YTB Defendants' website, which directs consumers to contact one of three corporate representatives with questions, all of whom are to be reached at the Wood River, Illinois Office at a 618 area code.

n.  YTB Defendants owned two different properties in Illinois through mortgage-based purchases and leased another.  Both the business and mailing address on SEC filings is the YTB Defendants' corporate office in Illinois.

o.  The contractual relationships between the Plaintiffs and Defendants were executed and became effective upon acceptance of the contract in the home office of Wood River, Illinois.

p.  Checks for all travel commission payments and OTA referral sales commissions were mailed to Plaintiffs from the Edwardsville, Illinois office and drawn from an Illinois bank account.

q.  Plaintiffs were directed by the Illinois office to use the business address of the Illinois Office in conducting YTB related transactions.

r.  A primary tool used in recruiting RTAs was annual "Red Carpet Days", wherein YTB Defendants opened up the doors of their corporate headquarters, located in

Wood River, Illinois, and invited members of the general public to come and visit. Thousands of people came to these events.

s. YTB Defendants' first annual shareholders' meeting was held in Godfrey, Illinois.

t. The arbitration clause in the YTB Defendants' contracts with Plaintiffs indicated that the location for arbitration in case of a breach should be Wood River, Illinois.

u. YTB Defendants held training sessions for RTAs/IMRs in Illinois.

v. YTB Defendants had regional meetings in Illinois where RTAs/IMRs would meet prospective OTA referrals.

w. All transactions related to travel purchases by the persons referred to YTB Defendants by Plaintiffs and their proposed class substantially occurred in Illinois, including but not limited to:

    i. responding to requests related to travel purchases;

    ii. processing payments for travel purchases;

    iii. issuance of travel documents;

    iv. cancellation of travel purchases;

    v. refunding travel purchases;

    vi. payment of the travel commissions for Plaintiffs and their proposed class; and

    vii. execution of all contracts concerning travel purchases.

55. Furthermore, the choice-of-law and forum-selections clauses in Defendants' contracts with Plaintiffs and their proposed class provided that all litigation shall be conduced in Illinois under Illinois law.

56. Plaintiffs and their proposed class understood and expected that Illinois law would apply to all claims against Defendants, including the claims at issue in this lawsuit.

57. All plaintiffs may sue under the ICFA because they were consumers of YTB Defendants' Products, and because YTB Defendants' actions were directed to the market

generally and otherwise affected the market and implicated consumer protection concerns.  YTB Defendants marketed and sold products and services to two different consumer markets.  First, Defendants marketed and sold products and services to the home-based business market.  The home-based business market is a billion dollar industry in the United States, and the consumers in this market are persons who buy business plans, business services and the right to operate home businesses.  The most visible members of this market are those entities that sell business plans and seminars for real estate speculation and invention submission on late night television.  YTB Defendants, both independently and through their referring agents, directed their operations to this home-based business market generally by marketing and selling the right to make money by referring travel customers to Defendants.  In fact, one of YTB Defendants marketing materials was what appears to be a 128 page magazine entitled "Success from Home," wherein readers could "discover the business changing 53 million lives."   YTB Defendants' marketing scheme sought primarily to reach consumers who were not already part of the travel industry to lure them to purchase their products and services.

58.    Inasmuch as YTB Defendants strictly controlled the actions of its RTAs/IMRs, and the RTAs/IMRs sold no products or services, Plaintiffs and their proposed class were the referring agents of YTB Defendants (i.e., the agents of travel agents) rather than individual business consumers.  In other words, although Plaintiffs purchased a "business opportunity" from YTB Defendants, Plaintiffs were not businesses that sold products or services under Williams Electronics or Dobrowski.  Rather, Plaintiffs were members of the home-based business market that consumed YTB Defendants' products and services.  Plaintiffs and their class were the end-users of the RTA/IMR licenses and OTA tools that documented and organized referral commissions.

59.    YTB Defendants, both independently and through their agents marketed their illegal "business opportunity" to the home-based business market at large.  YTB Defendants advertised and disseminated literature with respect to YTB "business opportunities" among the general public.  It held major conferences in St. Louis and "Red Carpet Days" in Wood River, Illinois, attended by thousands of members of the general public who were potential OTA buyers.  The rampant success of the illegal pyramid scheme perpetrated by YTB Defendants injured their competitors in the legitimate home-based business market by taking their customers.

60.    In marketing their products and services to the home-based business market, YTB Defendants made numerous false and misleading statements to the general public, including but not limited to:

a) that OTAs were travel agencies, when OTAs were only a means for RTAs to refer customers to YTB Defendants;

b) that RTAs were travel agents and/or travel professionals that sold travel, when RTAs could not sell travel and could only refer customers to YTB Defendants;

c) that any RTA could make a net profit from travel sales referrals, when this was impossible for most, if not all, RTAs;

d) that minimal effort by the consumer will earn thousands of dollars in travel commissions and increased effort by the consumer can earn $5,000 to $10,000 in travel commissions when it was nearly impossible, if not actually impossible, for any consumer to earn such amounts through the referral of travel customers;  and,

e) that travel customer referrals would earn YTB Defendants' consumers hundreds to thousands of dollars, when, in fact, 80% earned absolutely nothing, and the median annual travel commission earned was $0.

61.    Second, YTB Defendants marketed and sold products to the travel purchaser market generally.  As of 2007, YTB was considered the 26th largest travel agency in the United States, and their market share continued to grow.  YTB Defendants directed their operations at

17

the travel purchaser market generally by marketing and selling their products and services, such as airline tickets and cruise packages, to the public at large.  Moreover, YTB Defendants' illegal pyramid scheme injured both their travel agency competitors as well as travel consumers.  YTB Defendants stole market share from brick-and-mortar travel agencies, putting many out of business. Moreover, by eliminating their competition, YTB Defendants increased the cost of travel for travel consumers at large.  As such, Defendants' illegal pyramid scheme was directed at the travel consumer market generally, effected the consumer market and otherwise implicated consumer protection concerns.

### C.      Class Allegations

62.    This Court should certify classes against Defendants under Rules 23(b)(3) and 23(b)(1)(A).

63.    Both of Plaintiffs' Classes are defined as follows:

> All IMRs who paid non-reimbursed RTA fees to YTB
> International, Inc. and/or any of its subsidiaries.

Excluded from this Class are:  (1) any IMRs/RTAs who received commissions in excess of the fees which they paid; (2) Defendants, their employees, and all persons who have or had a controlling interest in the Defendant corporations; (3) Defendants' legal representatives, predecessors, successors and assigns; (4) the judge who is assigned to this case and his immediate family; and, (5) all persons who properly execute and file a timely request for exclusion from the class.

### i.      Rule 23(b)(a) Allegations

64.    Plaintiffs' class consists of over 1,000 members and is so numerous that joinder of all members is impracticable.

65.     The questions of law and fact are common to the class, including but not limited to:

    a.     Whether Illinois substantive law applies to Plaintiffs' claims.

    b.     Whether YTB Defendants' business constitutes an illegal pyramid sales scheme as defined by 815 ILCS 505/1(g).

    c.     Whether YTB Defendants' actions constitute an illegal chain referral sales technique in violation of 815 ILCS 505/2A(1).

    d.     Whether Plaintiffs suffered actual damages as a result of YTB Defendants' violations of 815 ILCS 505/2A(1).

    e.     Whether Plaintiffs suffered actual damages as a result of YTB Defendants' violations of 815 ILCS 505/2A(2).

    f.     Whether Plaintiffs' damages were proximately caused by YTB Defendants' violations of 815 ILCS 505/2A(1).

    g.     Whether Plaintiffs' damages were proximately caused by YTB Defendants' violations of 815 ILCS 505/2A(2).

66.     The claims of Plaintiffs' proposed class are typical in that all claims arise out of Section 505/2A of the Illinois Consumer Fraud and Deceptive Business Practices Act and concern the same illegal business practices by YTB Defendants.

67.     Plaintiffs will fairly and adequately protect the interests of the class.

**ii.     Rule 23(b)(3) Allegations**

68.     The individual class members do not have interests in controlling the prosecution of separate actions.  Even if individual class members could afford to prosecute this litigation alone, individual litigation magnifies the delay and expense to all parties and to the court system in resolving the controversies at issue.

69.     This was the first civil suit filed by these class members against the named Defendants.

70.     This is the most desirable forum for prosecuting this action because the YTB Defendants are located in located in this jurisdiction, because most of the discovery is in this jurisdiction and because most of the tortuous behavior occurred in this jurisdiction.

71.     Plaintiffs do not anticipate difficulties in managing a class action.  In comparison to individual actions by class members, a class action presents fewer management difficulties and provides the benefits of unitary adjudication, economies of scale and comprehensive supervision by a single court applying the substantive law of the state in which it is situated.

### iii.    Rule 23(a)(1)(A) Allegations

72.     Rule 23(b)(1)(B) of the Federal Rules of Civil Procedure provides for class certification when:

> adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests[.]

Fed. R. Civ. P. 23(b)(1)(B).

73.     Defendants do not have sufficient assets to satisfy the aggregated liquidated claims of Plaintiffs and their putative Class.  Accordingly, adjudication of this case would be dispositive or substantially impair the interests of others that are not parties to this lawsuit.

74.     The whole of the inadequate fund is to be devoted to the overwhelming claims.

75.     The claimants identified by a common theory of recovery shall be treated equitably among themselves.  They shall receive recovery in proportion to what they lost due to the subject pyramid scheme.

**D.     Cause of Action: Violation of §505/2A(2) of the Illinois Consumer Fraud and Deceptive Business Practices Act**

76.     Plaintiffs reincorporate and restate paragraphs 1-74 of this Amended Complaint.

77.     In violation of 815 ILCS 505/2A(2), YTB Defendants' business constitutes an illegal pyramid sales scheme as defined by 815 ILCS 505/1(g).  Plaintiffs paid money to YTB International, Inc. and/or one or more of its subsidiaries in the form of fees for OTAs.  In exchange, Plaintiffs received the opportunity to earn marketing commissions and rebates, or reimbursements of RTA fees, primarily based upon the inducement of additional persons to participate in the YTB pyramid scheme by buying OTAs and not primarily based upon the sale of travel or any other goods or services to consumers.

78.     YTB Defendants intended for Plaintiffs to make the payments described in the preceding paragraph in reliance upon YTB Defendants' promise of an opportunity to make money that was primarily based upon the inducement of others to participate in the YTB pyramid scheme by buying OTAs and not primarily based upon the sale of travel or any other consumer goods or services.

79.     YTB Defendants' deceptive business practice occurred in the course of trade or commerce.

80.     Plaintiffs and their proposed class suffered actual damages in excess of One Hundred Million Dollars ($100,000,000.00) as the proximate result of YTB Defendants' deceptive business practices.

**WHEREFORE**, Plaintiffs and their proposed class ask this Court to enter a judgment in excess of ***One Hundred Million Dollars ($100,000,000.00)*** for actual and punitive damages; to enter an Order permanently enjoining Defendants from continuing their illegal conduct; and for such other relief as the Court sees fit.

**VIII.   COUNT II – NATIONWIDE CLASS CLAIM AGAINST CONSPIRACY
DEFENDANTS FOR COMMON LAW CONSPIRACY UNDER ILLINOIS LAW**

81.   Plaintiffs incorporate and restate all preceding paragraphs in this Complaint.

82.   YTB Defendants perpetrated a tortious and illegal pyramid scheme and a tortious
and illegal chain sales referral technique.  Conspiracy Defendants acted in concert with YTB
Defendants by furthering their tortious and illegal objectives and actions.

83.   Conspiracy Defendants knowingly and voluntarily participated in a common
scheme to unlawfully and tortiously perpetrate an illegal pyramid scheme and a chain sales
referral technique.

84.   Conspiracy Defendants understood the general objectives of the tortious and
illegal pyramid scheme and chain sales referral technique, accepted them and agreed, either
explicitly or implicitly, to further those objectives.

85.   Conspiracy Defendants knowingly and voluntarily advanced and participated in
YTB Defendants' illegal pyramid scheme and chain sales referral technique by performing the
following non-exclusive list of actions:

   a.   On July 1, 2005, YTB International, Inc. entered into a contract with
   lessor Meridian Land Co. to lease approximately 13,000 square feet of property at
   One Country Club Drive, Edwardsville, Illinois. This property was owned and
   controlled by Meridian Land Co.

   b.   On November 1, 2005, YTB International, Inc. entered into a contract
   with lessor Meridian Land Co. to lease approximately 5,000 square feet at 600
   Country Club View Drive, Edwardsville , Illinois.  This property was owned and
   controlled by Meridian Land Co.

   c   The combined rental cost of the two aforementioned properties amounts to
   $15,000 per month.  Combined rent expense for these two leases was $137,300
   and $180,00 for the years ending December 31, 2007 and 2006 respectively.

   d.   On July 27, 2007, YTB International, Inc. entered into a purchase contract
   to buy the aforementioned property at  One Country Club View, Edwardsville,
   Illinois for $1,850,000, of which $480,500 was paid by the YTB International,

Inc. in cash as of the signing of the real estate contract, and the remaining $1,369,500 of which constituted obligations of Meridian Land Co. were paid and/or assumed by the YTB International, Inc. at the closing, consisting of (i) $1,305,525 principal amount of aggregate indebtedness owed by Meridian Land Co. to a local bank that was assumed by the YTB Defendants, (ii) $57,791 of accrued property taxes owed by Meridian Land for the subject property for 2006 and for a pro-rata portion of 2007, and (iii) $6,184 of assorted closing costs of Meridian Land Co.

e.      In January, 2008, YTB International purchased the aforementioned property located at 600 Country Club View Drive, Edwardsville, Illinois from Meridian Land Co for $2,350,000 in cash.  YTB International, Inc. paid $500,000 out of the $2,350,000 purchase price as a deposit as of the execution of the purchase contract, and the remaining $1,850,000 is due at the closing of the acquisition of this property, which was scheduled to occur in, or prior to May, 2008.

f.      In July, 2006, YTB International, Inc. borrowed $2.5 million from Meridian Bank in connection with its acquisition of the land and building which houses its corporate headquarters in Wood River, Illinois.

g.      During the year that ended December 31, 2007, YTB International, Inc. made aggregate payments of approximately $1,038,175 pursuant to the terms of the development contract for its corporate headquarters in Wood River, Illinois. The contract for the development of the real property on which such headquarters are located was awarded to Winfield Development LLC.  Winfield Development, LLC developed said property for an undisclosed fee.

h.      On August 17, 2007, YTB International, Inc. entered into a lease agreement with lessor Meridian Land Co. to rent approximately 5,500 square feet premises located at #112 Magnolia Drive (Lot #9 Magnolia Commons), Glen Carbon, Illinois.  Rent on this property is $8,400 per month.

i.      Conspiracy Defendants Timothy Kaiser, M.D. and Clay Winfield facilitated, directed and profited from the actions mentioned in subparagraphs (a)-(h) of this paragraph.

j.      CCMP, Inc. designed and manufactured all the marketing materials for YTB Defendants' illegal operations, and was paid no less than $7,000,000.00 for making these materials.  CCMP, Inc. was also paid for creating the 130 foot tall, 50,000 pound replica of the Statue of Liberty used at YTB Defendants' 2008 convention in St. Louis, Missouri.  CCMP, Inc. described this statue, which was approximately 85% of the size of the original statue, as the largest replica of Lady Liberty ever created.  It took 48 semi-tractor trailer trucks to transport this statue to St. Louis, Missouri.  While the actual cost was never disclosed, reports estimate

that CCMP, Inc. was paid over $8,000,000.00 for the statue.  YTB Defendants' 2008 convention lasted 5 days.

86.    Additional questions of law and fact are common to the class, including but not limited to:

a.    Whether Illinois common law applies to Plaintiffs' conspiracy claims;

b.    Whether Conspiracy Defendants' actions constituted civil conspiracy; and,

c.    Whether Plaintiffs suffered damages as a result of Conspiracy Defendants' civil conspiracy.

87.    Plaintiffs' claims are typical to those of their proposed class because they arise out of Illinois common law and they concern the same illegal conspiracy actions of Conspiracy Defendants.

88.    Plaintiffs and their class suffered damages in excess of One Hundred Million Dollars ($100,000,000.00) as the proximate result of Conspiracy Defendants' civil conspiracy.

**WHEREFORE**, Plaintiffs and their proposed class ask this Court to enter a judgment against Conspiracy Defendants for an amount in excess of ***One Hundred Million Dollars ($100,000,000.00)*** for actual and punitive damages.

## IX.   COUNT III – ALTERNATIVE STATEWIDE CLASS CLAIM AGAINST CONSPIRACY DEFENDANTS FOR COMMON LAW CONSPIRACY UNDER ILLINOIS LAW

89.    Illinois Plaintiffs incorporate by reference paragraphs 1-87 of this Complaint.

90.    In addition to those individuals excluded from the class definition in paragraph 63, Illinois Plaintiffs further exclude those individuals who are not citizens of the State of Illinois.

**WHEREFORE**, Illinois Plaintiffs and their proposed classes ask this Court to enter a judgment against Conspiracy Defendants for an amount in excess of ***One Hundred Million Dollars ($100,000,000.00)*** for actual and punitive damages.

## X.    COUNT IV – ALTERNATIVE STATEWIDE CLASS CLAIM AGAINST CONSPIRACY DEFENDANTS FOR COMMON LAW CONSPIRACY UNDER MISSOURI LAW

91.    Missouri Plaintiffs incorporate by reference paragraphs 1-87 of this Complaint.

92.    In addition to those individuals excluded from the class definition in paragraph 63, Missouri Plaintiffs further exclude those individuals who are not citizens of the State of Missouri.

93.    YTB Defendants perpetrated a tortious and illegal pyramid scheme.  Conspiracy Defendants acted in concert with YTB Defendants by furthering their tortious and illegal objectives and actions.

94.    Conspiracy Defendants knowingly and voluntarily participated in a common scheme to unlawfully and tortiously perpetrate an illegal pyramid scheme.

95.    Conspiracy Defendants understood the general objectives of the tortious and illegal pyramid scheme, accepted them and agreed, either explicitly or implicitly, to further those objectives.  Conspiracy Defendants had a meeting of the minds with YTB Defendants on the object or course of action for the pyramid sales scheme.

**WHEREFORE**, Missouri Plaintiffs and their proposed classes ask this Court to enter a judgment against Conspiracy Defendants for an amount in excess of ***One Hundred Million Dollars ($100,000,000.00)*** for actual and punitive damages.

XI.   **COUNT V – ALTERNATIVE STATEWIDE CLASS CLAIM AGAINST CONSPIRACY DEFENDANTS FOR COMMON LAW CONSPIRACY UNDER GEORGIA LAW**

96.   Georgia Plaintiffs incorporate by reference paragraphs 1-87 of this Complaint.

97.   In addition to those individuals excluded from the class definition in paragraph 63, Georgia Plaintiffs further exclude those individuals who are not citizens of the State of Georgia.

98.   YTB Defendants perpetrated a tortious and illegal pyramid scheme.  Conspiracy Defendants acted in concert with YTB Defendants by furthering their tortious and illegal objectives and actions.

99.   Conspiracy Defendants knowingly and voluntarily participated in a common scheme to unlawfully and tortiously perpetrate an illegal pyramid scheme.

100.   Conspiracy Defendants understood the general objectives of the tortious and illegal pyramid scheme, accepted them and agreed, either explicitly or implicitly, to further those objectives.  In other words, there was a meeting of the minds.  Conspiracy Defendants had a meeting of the minds with YTB Defendants on the object or course of action for the pyramid sales scheme.

101.   Conspiracy Defendants knowingly and voluntarily advanced and participated in YTB Defendants' tortious and illegal pyramid scheme.

**WHEREFORE**, Georgia Plaintiffs and their proposed classes ask this Court to enter a judgment against Conspiracy Defendants for an amount in excess of ***One Hundred Million Dollars ($100,000,000.00)*** for actual and punitive damages.

**XII.   COUNT VI – ALTERNATIVE STATEWIDE CLASS CLAIM AGAINST CONSPIRACY DEFENDANTS FOR COMMON LAW CONSPIRACY UNDER UTAH LAW**

102.   Utah Plaintiff incorporates by reference paragraphs 1-87 of this Complaint.

103.   In addition to those individuals excluded from the class definition in paragraph 63, Utah Plaintiff further excludes those individuals who are not citizens of the State of Utah.

104.   YTB Defendants perpetrated a tortious and illegal pyramid scheme.  Conspiracy Defendants acted in concert with YTB Defendants by furthering their tortious and illegal objectives and actions.

105.   Conspiracy Defendants knowingly and voluntarily participated in a common scheme to unlawfully and tortiously perpetrate an illegal pyramid scheme.

106.   Conspiracy Defendants understood the general objectives of the tortious and illegal pyramid scheme, accepted them and agreed, either explicitly or implicitly, to further those objectives.  In other words, there was a meeting of the minds.  Conspiracy Defendants had a meeting of the minds with YTB Defendants on the object or course of action for the pyramid sales scheme.

107.   Conspiracy Defendants knowingly and voluntarily advanced and participated in YTB Defendants' tortious and illegal pyramid scheme.

108.   Conspiracy Defendants' actions in promoting participation in an illegal pyramid scheme were intentional torts that were aimed at the State of Utah.

**WHEREFORE**, Utah Plaintiff and her proposed classes ask this Court to enter a judgment against Conspiracy Defendants for an amount in excess of ***One Hundred Million Dollars ($100,000,000.00)*** for actual and punitive damages.

Respectfully Submitted,
One of the Attorneys for Plaintiffs


  /s Christian G. Montroy
Montroy Law Offices, LLC
Christian G. Montroy IL Bar #6283566
412 Missouri Avenue
East St. Louis, Illinois 62201
Phone:  (618) 274-0434
Fax:      (618) 274-8369
cmontroy@montroylaw.com


## **CERTIFICATE OF SERVICE**


     I hereby certify that on December 11, 2012, I electronically filed the attached document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.


                                                      /s/ Christian G. Montroy